Filed 7/6/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION 5

| | |
|---|---|
| BULLSEYE TELECOM, INC., <br><br>     Petitioner, <br><br> v. <br><br> CALIFORNIA PUBLIC UTILITIES COMMISSION, <br><br>     Respondent, <br><br> QWEST COMMUNICATIONS COMPANY, LLC, <br><br>     Real Party in Interest. | A160729 <br><br> (Cal. PUC Decision Nos. 19-05-023 & 20-07-035) |
| ARRIVAL COMMUNICATIONS, INC., et al., <br><br>     Petitioners, <br><br> v. <br><br> CALIFORNIA PUBLIC UTILITIES COMMISSION, <br><br>     Respondent, <br><br> QWEST COMMUNICATIONS COMPANY, LLC, <br><br>     Real Party in Interest. | A160908 <br><br> (Cal. PUC Decision Nos. 19-05-023 & 20-07-035) |
| COX CALIFORNIA TELCOM, LLC, <br><br>     Petitioner, <br><br> v. | A160937 <br><br> (Cal. PUC Decision Nos. 19-05- |

| | |
|---|---|
| CALIFORNIA PUBLIC UTILITIES COMMISSION,<br><br>  Respondent,<br><br>QWEST COMMUNICATIONS COMPANY, LLC,<br><br>  Real Party in Interest. | 023 & 20-07-035) |

The business context surrounding the disputes in these consolidated cases may be simply stated: Qwest, the Real Party in Interest, AT&T, and Sprint are all long-distance carriers. In order to connect a specific California caller to a specific California recipient, long-distance carriers must purchase access to local exchange services provided by local carriers. The technical term for the services provided for local origination and termination of these long-distance telephone calls is "intrastate tandem-routed switched access services" ("switched access services"). The petitioners[1] in these cases are local carriers, operating local exchanges in California that provided services to Qwest, AT&T, and Sprint.

In its complaint to the Public Utilities Commission ("PUC" or "Commission"), Qwest alleged, among other things, that the petitioners discriminated against it by providing AT&T and Sprint with discounted rates

---

[1]Petitioners are Arrival Communications, Inc. (Arrival); BullsEye Telecom, Inc. (BullsEye); Cox California Telcom, LLC (Cox); Mpower Communications Corp. (Mpower); and U.S. TelePacific Corp. (TelePacific). Arrival, Mpower, and TelePacific are represented by the same counsel. Petitioners are referred to as Competitive Local Exchange Carriers (CLECs) by the Public Utilities Commission, which distinguishes them from the Incumbent Local Exchange Carriers that existed before the enactment of the Telecommunications Act of 1996. That act "allowed a new class of competitive local exchange carriers . . . into the local exchange market." (*AT&T Corp. v. F.C.C.* (D.C. Cir. 2002) 292 F.3d 808, 809; see also *In re Access Charge Reform* (2001) 16 F.C.C. Rec. 9923, 9931 (*Access Charge Reform*).) We commonly but not always refer to the CLECs as "local carriers" or "petitioners."

for switched access services.  Qwest concedes it was not charged more than the rates set forth in petitioners' tariffs filed with the Commission.  Qwest sought a refund of amounts it paid to petitioners in excess of the rates charged to AT&T and Sprint.

Petitioners seek writ review of the Commission's 2019 decision in Qwest's favor.  The Commission concluded Qwest showed that it was similarly situated to AT&T and Sprint and that there was no rational basis for treating Qwest differently with respect to the rates charged for switched access services.

In this writ proceeding, petitioners briefly argue the Commission erred in its legal approach to Qwest's discrimination claims, but they devote most of their briefing to three procedural claims and a claim that the Commission's remedy, an award of reparations to Qwest (in an amount yet to be determined), is unlawful.  Petitioners' claims are described at the outset of the Discussion section below.

The three petitions for writ of review were consolidated in this court, and we issued a writ of review.  We now reject petitioners' claims and affirm the Commission's decision.

## BACKGROUND[2]

As explained by the Commission, "Intrastate switched access is a service provided by the Defendant [local carriers] that allows [long-distance carriers] such as AT&T, Sprint, and Qwest to use . . . local exchange network[s] . . . to originate and terminate long distance calls to the vast majority of California residential and business customers.  Intrastate

---

[2] Petitioners do not challenge the factual and procedural summary in the Commission's decision, and we substantially rely on the Commission's decision in our background summary.

3

switched access is necessary for the provision of long-distance service . . . in California." (Fn. omitted.) (See also *AT&T Corp. v. F.C.C., supra*, 292 F.3d at p. 809; *United States v. W. Elec. Co.* (D.D.C. 1986) 627 F.Supp. 1090, 1095; *Iowa Network Services v. AT&T Corp.* (D.N.J, Oct., 2, 2019, Civ A. No. 3:14-cv-3439) 2019 U.S.Dist. LEXIS 170792, *3–*4.) It is undisputed that long-distance carriers have no control over which local carrier will provide switched access services on either end of the call and that, as the Commission stated below, long-distance carriers "have no choice but to use this service provided by the individual [local carriers] since there is no other way . . . to reach the retail subscribers who are making the underlying long distance call." Each of the petitioners has an intrastate switched access service tariff on file with the Commission. It is undisputed the petitioners did not file with the Commission the individual agreements with AT&T and Sprint providing for discounted rates.

In April 2009, Qwest filed a First Amended Complaint ("Complaint") with the Commission against 24 California local carriers, including the present petitioners.[3] In the first cause of action, Qwest alleged the local carriers engaged in rate discrimination in violation of section 453, subdivision (a), of the Public Utilities Code[4] by providing AT&T and/or Sprint (the "Contracting Carriers") switched access services at rates lower than those filed with the Commission and charged to Qwest, pursuant to individual agreements with the Contracting Carriers.[5] In the second and third causes of

---

[3] The original complaint was filed in August 2008. Fifteen local carriers were still involved in the proceeding at the time of the Commission decision at issue in this writ proceeding.

[4] All undesignated statutory references are to the Public Utilities Code.

[5] The Complaint also referenced MCI and Global Crossing as long-distance carriers that had entered into individual agreements, but it is not clear

4

action, Qwest alleged the local carriers violated section 532 and specified general orders by failing to file the tariffs in the individual agreements with the Commission and by failing to make the rates available to Qwest. Qwest requested that the Commission order the local carriers to pay Qwest reparations, with interest, "in an amount to be proven at hearing."[6]

In 2010, the Commission dismissed the Complaint on the ground that Qwest had failed to state a claim (Decision 10-07-030) (the "2010 Decision"). In 2011, the Commission granted Qwest's request for rehearing (Decision 11-07-058) (the "2011 Decision"). The 2011 Decision stated that a discrimination complainant, like Qwest, would "have to show that it was similarly situated and that there was no rational basis for such different treatment. A showing that rates lack uniformity is by itself insufficient to establish that they are unreasonable and hence unlawful. . . . [Citation.] Numerous characteristics of a particular customer -- volume, calling patterns, cost of negotiation, etc. -- could be sufficient to distinguish one customer from another." (*Id.* at 128.) Further, the complainant must have been "willing to enter into a contract with the same terms and conditions of service."

In October 2012, the Commissioner assigned to the matter issued a "scoping memo" for the proceeding pursuant to section 1701.1, subdivision (b)

---

whether they were alleged to have done so with California local carriers. In any event, the parties only reference AT&T and Sprint, who, we observe, were not parties to the proceedings below and are not involved in the present writ proceeding.

[6] The Commission found the long-distance carriers used financial leverage to obtain the discounted rates. Petitioners Bullseye, Arrival, Mpower, and TelePacific entered into the individual agreements with AT&T and/or Sprint after those long-distance carriers withheld payments. Cox's discounted rate was "based upon AT&T's purchase of large volumes of unrelated services such as special access (a dedicated service) or other non-jurisdictional services."

(the "Scoping Memo"), identifying eight core issues to be addressed in the proceeding. Among others, the issues identified included, "Whether different treatment was lawful because Qwest was not similarly situated or there was a rational basis for different treatment;" "Whether Qwest was willing and able to meet all of the substantive rates, terms and conditions of each of the contracts [providing other carriers discounted rates];" and "Has [the local carrier] engaged in unlawful conduct by failing to file its switched access agreement with the Commission or otherwise make the terms and conditions of that service publicly available?" The Scoping Memo stated, "The total reparations sought is approximately $22 million."

Thereafter, following what the Commission described as "extensive discovery," an Administrative Law Judge ("ALJ") conducted evidentiary hearings in 2013 that included testimony and the submission of "approximately 800 exhibits." In 2015, the ALJ issued a decision denying the Complaint. In Decision 16-02-020 (the "2016 Decision"), the Commission agreed and dismissed the Complaint. The 2016 Decision found Qwest was not similarly situated to the Contracting Carriers, there was a rational basis for the discount provided to the Contracting Carriers, and Qwest was not willing to enter into the terms of the individual agreements with those carriers.

Qwest requested rehearing of the 2016 Decision under section 1731. In 2019, in Decision 19-05-023 (the "2019 Decision"), the Commission granted rehearing regarding "(1) the determination as to whether Qwest was similarly situated to the [C]ontracting [C]arriers (. . . AT&T and Sprint); (2) whether Defendant [local carriers] had a rational basis for treating Qwest differently; (3) whether Defendant [local carriers] violated sections 453 and 532 by discriminating against Qwest; and (4) whether Defendant [local

6

carriers] failed to comply with the Commission's requirement to file (or otherwise make publicly available) off-tariff agreements." The Commission stated, "we will not order further proceedings on these issues." On the basis of the 2013 record, the Commission "superseded" the 2016 Decision in concluding that the defendant local carriers violated sections 453 and 532 by discriminating against Qwest and that the defendants should have filed the discount agreements with the Contracting Carriers. The decision was based in significant part on the Commission's prior characterization of switched access as a "monopoly bottleneck service."[7] The amount of refunds due Qwest as reparations for the discrimination would be determined in a separate phase of the proceeding.

Petitioners sought rehearing.[8] (§ 1731, subd. (b)(1).) The Commission denied rehearing but issued Decision No. 20-07-035 (the "2020 Decision"), which made certain modifications to the 2019 Decision. We refer to the 2019 Decision as modified by the 2020 Decision as the "Rehearing Decision."

---

[7] The concept of a "monopoly bottleneck" is rooted in antitrust law. Under the " 'bottleneck theory of antitrust law' . . . a business or group of businesses which controls a scarce facility has an obligation to give competitors reasonable access to it." (*Byars v. Bluff City News Co.* (6th Cir. 1979) 609 F.2d 843, 856; see also Kearney & Merrill, *The Great Transformation of Regulated Industries Law* (1998) 98 Colum. L. Rev. 1323, 1326, fn. 6 ["A bottleneck facility is 'a monopoly input needed by both its owner and its owner's competitors in the final product market.' "]; *Turner Broadcast System, Inc. v. F.C.C.* (1994) 512 U.S. 622, 656 [the provider of a "bottleneck" monopoly service is a "gatekeeper"].) The Commission does not define the phrase "monopoly bottleneck service," but it appears to use the phrase to refer to a service a company is required to obtain from another company in order to successfully deliver a product to the ultimate consumer and regarding which the purchaser of the service lacks choice in provider.
[8] Defendants Access One, Inc. and Utility Telephone, Inc. also sought rehearing, but they are not parties to this proceeding.

7

The present petitions for writ of review under section 1756 followed, filed by BullsEye (A160729); Arrival, Mpower, and TelePacific (A160908); and Cox (A160937).[9] The Commission and Qwest filed answers, and petitioners filed replies. (Cal. Rules of Court, rule 8.724.) This court granted the petitions for writ of review and the parties waived oral argument.

DISCUSSION

Petitioners present various claims of error. They claim the Commission violated sections 1731 and 1736 in failing to conduct an additional evidentiary hearing as part of the rehearing process. They also contend the Rehearing Decision failed to adhere to the legal framework in the Scoping Memo by (1) allowing Qwest to show it was willing and able to accept only the switched-access terms of the agreements with the Contracting Carriers; (2) finding Qwest was similarly situated to the Contracting Carriers without considering various factors the Commission identified in the 2011 and 2016 Decisions; and (3) treating differences in the cost of providing service as the only "rational basis" for different rates. Finally, petitioners contend the Commission violated sections 532 and 734 in concluding Qwest is entitled to refunds, because any such award would result in the company paying less than the filed tariffs and result in discrimination against other long-distance carriers. Petitioner Cox, on its own, raises several issues, including that the Commission improperly determined for the first time during the rehearing that switched access is a monopoly bottleneck service.

We reject petitioners' claims.

---

[9] The Cox petition was filed in the Fourth Appellate District, and the Arrival et al. petition was filed in the Second Appellate District, but the California Supreme Court transferred the cases to this district in September 2020. This court consolidated A160729, A160908, and A160937 for purposes of briefing, oral argument, and decision.

8

I.     *Writ Review Under Section 1756*

The Commission " 'is a state agency of constitutional origin with far-reaching duties, functions and powers.  (Cal. Const., Art. XII, §§ 1–6.) The Constitution confers broad authority on the [C]ommission to regulate utilities, including the power to fix rates, establish rules, hold various types of hearings, award reparation, and establish its own procedures.  (*Id.,* §§ 2, 4, 6.)' " (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 914–915; accord *Davis v. Southern California Edison Co.* (2015) 236 Cal.App.4th 619, 636.)  Additionally, the Public Utilities Act (§ 201 et seq.) "vests the [C]ommission with broad authority to 'supervise and regulate every public utility in the State' (§ 701) and grants the [C]ommission numerous specific powers for the purpose." (*San Diego*, at p. 915.)  " 'The [C]ommission's authority has been liberally construed' [citation], and includes not only administrative but also legislative and judicial powers [citation]." (*Ibid.*)  "Among these powers, the PUC has the power to issue equitable relief, including injunctive relief and reparations to ratepayers, as well as to assess fines and penalties.  [Citations.]  However, . . . the PUC's authority to order reparations to aggrieved ratepayers is limited to reparations for rates that are 'unreasonable, excessive, or discriminatory' (§ 734); the PUC does not have authority to award other damages." (*Davis*, at p. 636.)

Any party aggrieved by a Commission decision "may petition for a writ of review in the court of appeal . . . for the purpose of having the lawfulness of the original order or decision or of the order or decision on rehearing inquired into and determined." (§ 1756, subd. (a).)  "Because review by extraordinary writ is the only means of judicial review, a court ordinarily has no discretion to deny a timely-filed petition for writ of review if it appears that the petition

9

may be meritorious." (*Southern California Edison Co. v. Public Utilities Com.* (2006) 140 Cal.App.4th 1085, 1096 (*Southern California Edison*).) Accordingly, this court issued a writ of review to assess the merits of the petitioners' contentions. (See *PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1193 (*PG&E Corp.*) [granting writ of review but denying relief].)

Our role in reviewing the Commission's decisions is "limited." (*City and County of San Francisco v. Public Utilities Com.* (1985) 39 Cal.3d 523, 530.) "In a complaint or enforcement proceeding, . . . the review by the court shall not extend further than to determine, on the basis of the entire record which shall be certified by the [C]ommission, whether any of the following occurred: [¶] (1) The [C]ommission acted without, or in excess of, its powers or jurisdiction. [¶] (2) The [C]ommission has not proceeded in the manner required by law. [¶] (3) The decision of the [C]ommission is not supported by the findings. [¶] (4) The findings in the decision of the [C]ommission are not supported by substantial evidence in light of the whole record. [¶] (5) The order or decision of the [C]ommission was procured by fraud or was an abuse of discretion. [¶] (6) The order or decision of the [C]ommission violates any right of the petitioner under the Constitution of the United States or the California Constitution." (§ 1757, subd. (a); see also *PG&E Corp., supra*, 118 Cal.App.4th at p. 1193.)

"[W]hen no constitutional issue is presented, a PUC decision has the same standing as a judgment of the superior court: it is presumed correct, and any party challenging the decision has the burden of proving that it suffers from prejudicial error." (*Pacific Gas & Electric Co. v. Public Utilities Com.* (2015) 237 Cal.App.4th 812, 838.) "Generally, we give presumptive value to a public agency's interpretation of a statute within its administrative

10

jurisdiction because the agency may have 'special familiarity with satellite legal and regulatory issues,' leading to expertise expressed in its interpretation of the statute. [Citation.] Therefore, 'the PUC's "interpretation of the Public Utilities Code should not be disturbed unless it fails to bear a reasonable relation to statutory purposes and language. . . ." [Citation.] However, "the general rule of deference to interpretations of statutes subject to the regulatory jurisdiction of agencies does not apply when the issue is the scope of the agency's jurisdiction." [Citation.] Even in cases not questioning the jurisdiction of an agency, the interpretation of statutes is a question of law subject to independent judicial review.' " (*Pacific Bell Wireless, LLC v. Public Utilities Com.* (2006) 140 Cal.App.4th 718, 729 (*Pacific Bell Wireless*); see also *Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781, 796 (*Peevy*); *New Cingular Wireless PCS, LLC v. Public Utilities Com.* (2016) 246 Cal.App.4th 784, 806–807 (*New Cingular*); *PG&E Corp.*, *supra*, 118 Cal.App.4th at pp. 1194–1195.)

II. *The Commission Did Not Fail to Conduct a Rehearing*

Petitioners contend the Commission failed to conduct a "rehearing" as required by sections 1731 and 1736 before modifying and superseding the 2016 Decision. We reject the claim.

Section 1731, subdivision (b)(1) provides that, "After an order or decision has been made by the [C]ommission, a party to the action or proceeding . . . may apply for a rehearing in respect to matters determined in the action or proceeding and specified in the application for rehearing. The [C]ommission may grant and hold a rehearing on those matters, if in its judgment sufficient reason is made to appear." Further, section 1736 provides, "If, after such rehearing and a consideration of all the facts, including those arising since the making of the order or decision, the

11

[C]ommission is of the opinion that the original order or decision or any part thereof is in any respect unjust or unwarranted, or should be changed, the [C]ommission may abrogate, change, or modify it."

In the present case, Qwest requested rehearing of the 2016 Decision, and petitioners filed a response. In the 2019 Decision, the Commission granted the request for a rehearing on specified issues. In the same decision, the Commission explained, "we will not order further proceedings on these issues. Instead, based on the record evidence and the law, we will reverse our determinations in [the 2016 Decision], and find that Qwest was similarly situated to the [C]ontracting [C]arriers and there was no rational basis for treating Qwest differently. Thus, we determine that Defendant [local carriers] have violated section 453 and 532 by discriminating against Qwest. Further, and contrary to our conclusion in [the 2016 Decision], we determine that the Defendants failed to comply with the Commission's requirements to file (or otherwise make publicly available) off-tariff agreements. [¶] Thus, we will supersede those portions of [the 2016 Decision] which are inconsistent with today's decision. Further, we will open a Phase II to consider the issue regarding refunds." Subsequently, petitioners filed their own application for rehearing. The 2020 Decision modified the 2019 Decision in various respects and stated, "Rehearing of [the 2019 Decision], as modified, is denied as no legal error has been demonstrated."

Petitioners contend the Commission failed to proceed in the manner required by sections 1731 and 1736 because the Commission failed to conduct additional *evidentiary* proceedings after deciding to rehear the 2016

12

Decision.[10]  The Commission concluded it was not required to conduct such proceedings, stating in the Rehearing Decision that "[t]here is no language in sections 1731 through 1736 [Article 2. Rehearings] requiring the Commission, upon granting rehearing, to hold another evidentiary hearing." Petitioners disagree, arguing essentially that "A 'rehearing' is simply another 'hearing.' "

It is undisputed the regular "hearing" procedures require the taking of evidence.  Section 1701.1, subdivision (b)(1), provides that a commissioner assigned to a new adjudication proceeding[11] "shall schedule a prehearing conference and shall prepare and issue by order or ruling a scoping memo that describes the issues to be considered and the applicable timetable for resolution and that, consistent with due process, public policy, and statutory requirements, determines whether the proceeding requires a hearing." Section 1701.2, subdivision (b) provides that if the commissioner "has determined that an adjudication case requires a hearing, the assigned commissioner or the assigned administrative law judge shall hear the case in the manner described in the scoping memo."  Hearing the case includes developing a "record" to support "findings of fact on all issues material to the decision."  (§ 1701.2, subd. (e).)  Section 1705 provides, "At the time fixed for any hearing before the [C]ommission or a commissioner . . . the complainant

---

[10] Petitioners also argue the Commission was required to schedule a prehearing conference, prepare a new scoping memo, and proceed to a hearing before a commissioner or administrative law judge who would issue a new decision.  We need not separately address those contentions because if the Commission was not required to conduct a new evidentiary hearing, neither was it required to comply with those other aspects of the regular hearing procedures.
[11] Section 1701.1, subdivision (d)(2) provides that cases arising from complaints are adjudication proceedings.

13

and the corporation or person complained of, and such corporations or persons as the [C]ommission allows to intervene, shall be entitled to be heard and to introduce evidence."

Petitioners point out that the rehearing provisions (sections 1731 through 1736) and the hearing provisions (sections 1701 through 1711) are both included in Chapter 9 of the Public Utilities Act ("Hearings and Judicial Review"). Further, they point out that section 1701, subdivision (a) states, "All hearings, investigations, and proceedings shall be governed by this part and by rules of practice and procedure adopted by the [C]ommission . . . ." But that language is not helpful to petitioners absent any statutory language stating that a "rehearing" is equivalent to a "hearing."[12]

In support of their position that any rehearing requires compliance with the regular hearing procedures in section 1701 et seq., petitioners point to section 1702.1, entitled "[e]xpedited complaint procedure for small claims." Under that section, "when the amount of money claimed does not exceed the jurisdictional limit of the small claims court," the Commission may entertain the complaint in an expedited proceeding without attorneys or a reporter. The provision relied upon by petitioners, section 1702.1, subdivision (d), provides that the parties to such an expedited proceeding "may file applications for rehearing pursuant to Section 1731. If the [C]ommission grants an application for rehearing, *the rehearing shall be conducted under the [C]ommission's regular hearing procedure.*" (Emphasis added.)

---

[12] Petitioners also cite various provisions from disparate areas of the law that use the term "rehearing." But none state that a "rehearing" is necessarily equivalent to a "hearing" or that a "rehearing" must always involve the taking of additional evidence. Further, rehearing procedures in other statutory contexts do not control our interpretation of the Public Utilities Code.

Petitioners argue that "[i]n Section 1702.1, the Legislature, evidenced its understanding that a 'rehearing' is simply another hearing." However, we believe the provision supports the *opposite* conclusion. In the situation contemplated by section 1702.1, subdivision (d), the parties will *not* have had the benefit of an initial proceeding with the opportunity to be represented by counsel and to create a full record. Thus, it is logical in that situation to provide the parties that opportunity on rehearing. Moreover, the inclusion of the specific "regular hearing procedure" language in the context of rehearings in expedited cases demonstrates that the Legislature knew how to mandate such procedures where intended; the absence of similar language in section 1731 or 1736 supports a conclusion that other rehearings do *not* need to be conducted "under the [C]ommission's regular hearing procedure" (§ 1702.1, subd. (d)).

The conclusion that a rehearing does not require additional evidentiary hearings is also supported by comparing the procedures in section 1708. Section 1708 provides, "The [C]ommission may at any time, upon notice to the parties, and with opportunity to be heard as provided in the case of complaints, rescind, alter, or amend any order or decision made by it." Section 1708 "permits the [C]ommission at any time to reopen proceedings even after a decision has become final," while section 1736 empowers the Commission "to rehear a decision not yet final." (*City of Los Angeles v. Public Utilities Com.* (1975) 15 Cal.3d 680, 706, italics omitted.) Critically, the language in section 1708 requiring that parties be provided "opportunity to be heard as provided in the case of complaints" means the parties must be provided an opportunity to present evidence. (*California Trucking Assn. v. Public Utilities Com.* (1977) 19 Cal.3d 240, 244–245.) As the Supreme Court explained in concluding a company had been denied its rights under section

15

1708, "[t]he procedure applicable to hearings on complaints filed by the [C]ommission on its own motion, as occurred here, is prescribed in sections 1701–1706. Section 1705 requires a hearing at which parties are entitled to be heard and to introduce evidence, and the [C]ommission must issue process to enforce the attendance of witnesses." (*California Trucking*, at pp. 244–245.) In contrast, sections 1731 and 1736 do not provide that, before issuing a decision on rehearing, the Commission must provide an "opportunity to be heard as provided in the case of complaints" or equivalent language.

Petitioner Cox points to section 1734, which provides in part, "If any application for a rehearing is granted without a suspension of the order involved, the [C]ommission *shall forthwith proceed to hear the matter* with all dispatch and shall determine the matter within 20 days after final submission." (Italics added.) The use of the term "hear" in that statute does not mandate that the Commission follow any particular procedure, in contrast to section 1702.1, subdivision (d) ("under the [C]ommission's regular hearing procedure") and section 1708 ("with opportunity to be heard as provided in the case of complaints"). The contrast between the section 1731 et seq. rehearing provisions and sections 1702.1 and 1708 is persuasive evidence the Legislature did *not* intend to mandate that the Commission employ particular procedures on rehearing—the Legislature clearly knows how to include such mandates when it intends to do so. (See *People v. Norwood* (1972) 26 Cal.App.3d 148, 156 ["It is a settled rule of statutory construction that where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes."]; accord *Los Angeles*

16

*County Metropolitan Transportation Authority v. Alameda Produce Market, LLC* (2011) 52 Cal.4th 1100, 1108.)[13]

We observe that section 1736 only permits the Commission to modify a decision "after such rehearing and a consideration of all the facts, *including those arising since the making of the order or decision . . . .*" (Italics added.) That language could, in an appropriate case, require the Commission to receive evidence of factual developments occurring after the decision being reheard. However, in the present case, the parties do not identify any relevant factual matters arising after the 2016 Decision. Instead, petitioners argue that, following the Commission's determination in the Rehearing Decision that its legal analysis of the facts established in the 2013 hearing had been faulty, petitioners were denied the opportunity to present evidence under that changed legal analysis.[14] As explained in Part IV.C.2, *post*, petitioners have not demonstrated they were denied an opportunity to present evidence in the original evidentiary proceedings relevant to the issues as framed in the Rehearing Decision. For purposes of the present argument, it is clear petitioners have not shown the Commission violated

---

[13] The language of sections 1731 and 1736 derives from section 66 of the 1915 Public Utilities Act, codified as part of the Public Utilities Code in 1951. (Stats. 1915, ch. 91; Stats. 1951, ch. 764; see also footnote 28, *post*.) This court has reviewed the legislative histories of the 1915 and 1951 enactments, and we have found nothing that aids in interpreting sections 1731 and 1736. In addition, the parties do not direct our attention to any relevant legislative history.

[14] For example, Bullseye and Arrival et al. argue that "a more focused Scoping Memo would likely elicit a more granular showing on facts that arose prior to the 2016 Decision, the issues of cost-of-service and the effect of 'economic duress.'" Petitioners also *speculate* there could be relevant facts arising after 2013, but such speculation is insufficient to demonstrate "prejudicial error." (*Pacific Gas & Electric Co. v. Public Utilities Com.*, *supra*, 237 Cal.App.4th at p. 838.)

section 1736, requiring consideration of facts "arising since the making of the order or decision." Indeed, the inclusion of that language rather than a broader directive to conduct additional evidentiary hearings is further support for a conclusion that the Legislature did not intend to require the standard "hearing" procedures to apply to "rehearings."

Petitioners contend the Commission never "reheard" the matter because the Commission "granted a rehearing of the 2016 Decision and then reversed it in the same order." However, the record shows the petitioners responded to Qwest's rehearing petition and subsequently presented their own rehearing application, resulting in the Rehearing Decision on review. Petitioners present no reasoning or authority why the Commission's consideration of the parties' briefs and reconsideration of the facts and law in preparing the Rehearing Decision does not constitute the "rehearing" contemplated by section 1736.

Finally, our conclusion that the Commission did not err in issuing the Rehearing Decision without conducting an additional evidentiary hearing is supported by the proposition that "[o]n judicial review, the [Commission's] decisions historically have been generally presumed valid, not to be disturbed absent a manifest abuse of discretion or unreasonable interpretation of the relevant statute, particularly on matters of procedure." (*New Cingular, supra*, 246 Cal.App.4th at p. 806; see also *Peevey, supra*, 31 Cal.4th at p. 796, quoting *Greyhound Lines, Inc. v. Public Utilities Com*. (1968) 68 Cal.2d 406, 410–411 ["PUC's interpretation of the Public Utility Code 'should not be disturbed unless it fails to bear a reasonable relation to statutory purposes

18

and language"].)  As explained above, the Commission's interpretation is the most reasonable interpretation of the statutory scheme.[15]

III.    *The Monopoly Bottleneck Service Determination*

Petitioner Cox contends that prior to the Rehearing Decision the Commission had never decided that switched access is a monopoly bottleneck service, "and, in so doing, adopted and applied a new regulation retroactively in violation of its procedural rules."  Cox has not shown the Commission failed to proceed in the manner required by law.

We agree with the assertion in the Rehearing Decision that "[t]he Commission has long recognized that switched access is a monopoly bottleneck service."  Over 25 years ago, before the Telecommunications Act of 1996 ("Telecommunications Act") opened up local telephone markets to increased competition, the Commission stated the following: "The foundation for telecommunications in this country remains to a large degree the public switched network developed and owned by the [monopoly local carriers]. Consequently, companies operating in relatively competitive telecommunications areas, such as [long-distance carriers], are frequently compelled to purchase services from the monopoly [local carriers] when no other company offers the service and no reasonable alternatives to the service are available.  Of particular concern are the essential services called monopoly building blocks or bottleneck functions. ¶ . . .  An instructive example is the monopoly building block most pertinent to this proceeding: the

_____

[15] We also reject petitioner Cox's suggestion in its reply that, regardless of whether the Commission was required to conduct additional evidentiary proceedings, petitioners were entitled to "actually appear and be heard after the Commission grants rehearing."  Petitioners have not demonstrated the statutory scheme contains any specific procedural mandates that were applicable to the rehearing below.

19

need for [long-distance carriers] to purchase access services from the [monopoly local carrier]. Without access from [the local carrier's] point of presence to the end-user, the [long-distance carrier] would be cut off from the bulk of its actual and potential customers and would be unable to deliver calls to the intended recipients." (*In re Alternative Regulatory Frameworks for Local Exchange Carriers* (1994) 56 Cal. P.U.C.2d 117, 227 (*ARF Decision*).)

Petitioner Cox asserts the Commission has never determined the issue in the context of local carriers, like petitioners, admitted into the market by the Telecommunications Act. Cox asserts that the pre-Act incumbent local exchange carriers and the post-Act competitive local carriers "are two different types of carriers that were subject to very different regulatory frameworks during the time period at issue." However, even assuming that is true, Cox fails to rebut the Commission's reasoning in this proceeding that "It is the nature of the service that is determinative, not who provides it." That is, petitioner Cox does not explain why switched access is any less a monopoly bottleneck service when offered by Cox rather than by the pre-Act incumbent local carriers. Given that the monopoly bottleneck service determination in the *ARF Decision* turned on the nature of the services, we reject Cox's contention the Commission was required to make an express determination that the same analysis would apply when the services were provided by a local provider like Cox before applying that analysis in this case.

Petitioner Cox also contends a 2007 decision, *Order Instituting Rulemaking to Review Policies Concerning Intrastate Carrier Access Charges* (2007) 2007 Cal. PUC LEXIS 609 (*Intrastate Carrier Access Charges*), supports its position that the switched access services it provides have *not*

20

been treated as monopoly bottleneck services.  We disagree.  At the outset, we note that question was not before the Commission, which decided in that proceeding to cap competitive local carrier access charges in response to a petition by a long-distance carrier seeking a reduction in such charges. (*Id*. at *2.)  The decision does not use the phrase "monopoly bottleneck service," but it does acknowledge the monopoly nature of the service, stating "The record shows allegations of competitive [local] carriers imposing excessive intrastate access charges, and that the purchasing [long-distance] carriers are unable to seek alternatives to terminating the call traffic." (*Id*. at *23.)  The Commission referenced an FCC decision imposing a different cap on competitive local carrier rates due to similar concerns.  (*Intrastate Carrier Access Charges*, at *23.)[16]  That FCC decision expressly acknowledged switched access services are monopoly bottleneck services, stating that "the terminating and the originating access markets" consist "of a series of bottleneck monopolies over access to each individual end user." (*In re Access Charge Reform*, *supra*, 16 F.C.C. Rec. at p. 9935; see also *AT&T Corp. v. F.C.C.*, *supra*, 292 F.3d at pp. 809–810.)  Accordingly, the Commission's *Intrastate Carrier Access Charges* decision implicitly treats switched access services provided by carriers like Cox as monopoly bottleneck services even if the decision does not use that phrase.

Petitioner Cox also focuses on a statement in the 2007 decision that "Existing contracts between carriers that specify intrastate access charges are not affected by this decision.  Carriers may voluntarily contract with each other to pay intrastate access charges different from those adopted in today's

---

[16] The Commission did not provide a citation to the FCC decision, but the Commission's description matches the decision in *In re Access Charge Reform*, *supra*, 16 F.C.C. Rec. 9923.

decision." (*Intrastate Carrier Access Charges*, *supra*, 2007 Cal. PUC LEXIS 609 at \*25.)  Cox appears to construe that sentence to mean that its agreement providing a discounted rate to AT&T is lawful, but the sentence only exempts agreements from the rate caps adopted in the decision.  We reject petitioner Cox's suggestion that the sentence means the Commission did not consider switched access a monopoly bottleneck service or that the Commission intended to express any opinion on whether lower, unfiled rates not offered to all long-distance carriers could provide the basis for a discrimination claim.[17]

We also reject petitioner Cox's assertion that the Commission's decision in *Intrastate Carrier Access Charges* "to impose a rate cap *instead* of requiring rates to be cost-based means that it did not consider the service to be a monopoly bottleneck."  In fact, the Commission emphasized the general principle that "To the extent practical, intrastate access charges should be cost-based and competitive carriers should charge only for functions provided to transport a call." (*Intrastate Carrier Access Charges*, *supra*, 2007 Cal. PUC LEXIS 609 at \*32.)  The Commission noted that it had previously "eliminated the non-cost-based component of [AT&T and Verizon's] access charges," and

---

[17] Petitioner Cox also argues the *Intrastate Carrier Access Charges* decision impliedly authorized local carriers *not* to file contracts providing rates for switched access services, because the Commission did not state that local carriers were required to do so, despite being requested to provide clarification on that topic during the rehearing process.  However, Cox has not shown that was an issue before the Commission in the proceeding, and we reject the contention that the absence of direction on the issue constituted a determination a carrier like Cox was *not* required to file its agreement with AT&T.  We observe that "[o]ne of the principal reasons for requiring a utility to publish all its rates and conditions of service in a tariff is to prevent or at least deter discrimination." (*Application of PT&T Co. re 770A PBX Contracts and Consolidated Proceedings* (1978) 83 Cal. P.U.C. 428, 436–437.)

that it was "extend[ing] the policy [in that prior decision] to mid-sized, small, and [competitive local carriers] but tailor[ing] the specific implementation requirements to fit the unique characteristics of each carrier group." (*Id.* at *19-*20.) Cox fails to explain why the Commission's analysis is inconsistent with a recognition that switched access is a monopoly bottleneck service.

In sum, petitioner Cox has failed to show the Rehearing Decision made a novel determination in treating switched access services as monopoly bottleneck services in its analysis of Qwest's discrimination claim.[18]

IV.     *The Commission Did Not Err with Respect to the Scoping Memo*

Petitioners Bullseye and Arrival et al. summarize petitioners' next claim of error as follows: "[T]he Commission did not adhere to the Scoping Memo that has governed the hearings and briefing of this matter since 2012. The 2019 Decision essentially rescinded a critical issue to be considered, . . . whether Qwest was willing and able to meet all of the substantive rates, terms and conditions of each of the contracts at issue . . . . The Decision also narrowed the [issue] of 'whether different treatment was lawful because Qwest was not similarly situated or there was a rational basis for different treatment' (Scoping Memo, issue (d)), to a single [factor]: whether there was a difference in the cost-of-service to the [C]ontracting [C]arriers and Qwest, a criterion not set forth in the Scoping Memo."[19] We reject petitioners' claims.

---

[18] Because we reject petitioner Cox's contention the Rehearing Decision made a new determination in this respect, we need not address whether any such determination would constitute the adoption of a new rule or regulation, as Cox asserts.

[19] As mentioned in the background section, in October 2012, the Commissioner assigned to the matter issued a Scoping Memo identifying eight core issues to be addressed in the proceeding, including (as relevant to the present argument) "Whether different treatment was lawful because Qwest was not similarly situated or there was a rational basis for different

A.    *Legal Background*

Section 1701.1, subd. (b)(1)), provides, "The [C]ommission, upon initiating an adjudication proceeding or ratesetting proceeding, shall assign one or more commissioners to oversee the case and an administrative law judge when appropriate.  The assigned commissioner shall schedule a prehearing conference *and shall prepare and issue by order or ruling a scoping memo that describes the issues to be considered* and the applicable timetable for resolution and that, consistent with due process, public policy, and statutory requirements, determines whether the proceeding requires a hearing."  (Italics added.)  (See also *Southern California Edison, supra*, 140 Cal.App.4th at p. 1104.)  Section 1701.2, subdivision (b) provides, "the assigned commissioner or the assigned administrative law judge shall hear the case in the manner described in the scoping memo."

Qwest brought its discrimination complaint under section 453, subdivision (a), which provides, "No public utility shall, as to rates, charges, service, facilities, or in any other respect, make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage."  Qwest's discrimination claim was also brought under section 532, which provides, "no public utility shall charge, or receive a different compensation for any product or commodity furnished or to be furnished, or for any service rendered or to be rendered, than the rates, tolls, rentals, and charges applicable thereto as specified in its schedules on file and in effect at the time, . . . nor shall any such public utility refund or remit, directly or indirectly, in any manner or by any device, any portion of the rates, tolls, rentals, and charges so specified, nor extend to any

---

treatment" and "Whether Qwest was willing and able to meet all of the substantive rates, terms and conditions of each of the contracts at issue."

24

corporation or person any form of contract or agreement or any rule or regulation or any facility or privilege except such as are regularly and uniformly extended to all corporations and persons."

The California Supreme Court provided some guidance regarding rate discrimination in *Hansen v. City of San Buenaventura* (1986) 42 Cal.3d 1172 (*Hansen*), although the decision makes no reference to sections 453 and 532. There, the court stated, "A showing that rates lack uniformity is by itself insufficient to establish that they are unreasonable and hence unlawful. To be objectionable, discrimination must 'draw an unfair line or strike an unfair balance between those in like circumstances having equal rights and privileges. . . . "It is only unjust or unreasonable discrimination which renders a rate or charge unreasonable." ' " (*Id.* at pp. 1180–1181.)

B.    *The Commission's Treatment of the "Willing and Able" and "Rational Basis"/"Similarly Situated" Issues*

1.    *The "Willing and Able" Issue*

Petitioners contend the Rehearing Decision did not address whether Qwest was willing and able to enter into the full agreements the Contracting Carriers entered into. Petitioners point out that the Commission's prior decisions in the proceeding emphasized the importance of that issue. Thus, the 2011 Decision, which vacated dismissal of Qwest's complaint, quoted a prior Commission decision for the proposition that " '[C]ontracting with individual customers at rates that deviate from those available under the tariffs raises the issue of whether such contracts violate the nondiscrimination provisions of [section] 453[, subdivision (a)]. Courts reviewing this issue under statutes similar to [section] 453 have concluded that such contracts are permissible if the rates under the contract are made available to any similarly situated customer willing to meet the contract's terms.' " (See *ARF Decision, supra,* 56 Cal. P.U.C.2d 117, 243.) Then, in

25

2012, the Scoping Memo included the willing and able inquiry as issue (f). And the 2016 Decision found *against* Qwest on that issue, determining that "Qwest did not demonstrate that it was willing to accept all of the contract terms between the Defendant [local carriers] and the [C]ontracting [C]arriers." Rather, Qwest stated "it would have been willing to meet only the switched access service-related terms and conditions of each of the agreements between the [local carriers] and the [C]ontracting [C]arriers."

Although the 2019 Decision addressed the issue in a footnote, the Rehearing Decision included a separate heading, "Willingness to accept the same contract terms and conditions." The Rehearing Decision proceeded to *reject* the analysis in the 2016 Decision because switched access is a monopoly bottleneck service. The Commission reasoned, "The evidence in the record demonstrates that Qwest was willing and able to meet the intrastate switched access service related terms and conditions of each of the contracts. If we were to require Qwest or any other [long distance carrier] to have to accept the exact same terms and conditions in contracts that include a monopoly bottleneck service along with other dedicated or non-jurisdictional services, we would defeat the purpose of our statutory obligation to prevent discrimination under section 453 and 532."

2. *The "Rational Basis"/"Similarly Situated" Issue[20]*

Petitioners next assert the Rehearing Decision improperly "departed from the [S]coping [M]emo" by narrowing the grounds that could constitute a

---

[20] The rational basis and similarly situated questions were intertwined, because a difference in the cost of providing switched access services was the one factor the Rehearing Decision specifically identified that could justify either a finding that Qwest was not similarly situated to the Contracting Carriers or that there was a rational basis for the different treatment of Qwest.

rational basis for offering different rates to different long-distance carriers. The Commission first addressed the issue in this proceeding in the 2011 Decision vacating dismissal of the Complaint. The 2011 Decision did not specify the error it found in the 2010 Decision, but it did summarize the showing required for a discrimination claim, stating "To prove discrimination, a carrier will have to show that it was similarly situated and that there was no rational basis for such different treatment. [Citation.] 'A showing that rates lack uniformity is by itself insufficient to establish that they are unreasonable and hence unlawful. . . .' [Citation.] 'Numerous characteristics of a particular customer -- volume, calling patterns, cost of negotiation, etc. -- could be sufficient to distinguish one customer from another.' " Contrary to petitioners' suggestion, the 2011 Decision does not purport to provide a conclusive or comprehensive list of factors that might constitute a rational basis for different treatment of long-distance carriers by local carriers.

The 2012 Scoping Memo followed and identified as issue (d) for determination: "[w]hether different treatment was lawful because Qwest was not similarly situated or there was a rational basis for different treatment." We observe the Scoping Memo does *not* specify what can constitute a rational basis, and it does *not* limit the range of factors regarding which the parties could present evidence. It is also significant that, in this proceeding, Qwest had previously taken the position that, because switched access is a monopoly bottleneck service, only a difference in the cost of providing the service could justify different rates. Thus, for example, the 2010 Decision summarized Quest's argument as follows: "In its opening brief, Qwest explained that the Commission's 2007 decision reinforces the bottleneck nature of access services, and supports Qwest's allegations that offering lower rates to certain

27

carriers is unlawful and discriminatory. Qwest also stated that the 'mere existence' of off-tariff contracts did not necessarily violate California law or Commission regulation, but that offering different rates 'could only be justified where the provider . . . establishes that the relevant economic cost . . . varies between customers.' "

Following the 2013 evidentiary hearings, the 2016 Decision found the evidence showed the local carriers "were required to make a rational, economics-based business decision to grant discounts to the [C]ontracting [C]arriers rather than run the risk of not being paid." The decision did not address whether the different treatment could be based on a difference in the cost of providing the services. The decision stated there was "no evidence provided at [the] hearing by either party which revealed the actual cost that the [local carriers] incurred to route intrastate switched access service within California." Therefore, it concluded, "the underlying cost to provide switched access service to Qwest versus to the [C]ontracting [C]arriers cannot be considered here for purposes of deciding whether Qwest and the contracting carrier were similarly situated." Although the 2016 Decision did not reach the cost issue, it implicitly rejected the proposition that the rate difference could *only* be supported by a showing of a difference in the cost of providing services.

The Rehearing Decision rejected the 2016 Decision's understanding of the record and its reasoning. The Rehearing Decision concluded Qwest had shown it was similarly situated to the Contracting Carriers vis-à-vis the cost of providing switched access services. The decision explained, "The evidence in the record supports the conclusion that the functionality and service elements used by the Defendant [local carriers] to provide . . . switched access to Qwest and to the [C]ontracting [C]arriers were/are identical, as were/are

28

the facilities they were/are provided over. . . . The Defendant [local carriers] enjoy monopoly bottleneck control over switched access services provided to their end user customers without regard to the identity of the [long distance carrier] or the volume of calls completed. . . . Thus, on a call-by-call basis, every [long distance carrier] is similarly situated." The Commission agreed the issue was whether there was a *difference* in the cost of providing the services, not the *actual cost* of providing the services. " 'Whether it cost the Defendant [local carrier] one cent or five cents per minute to provide AT&T switched access is not relevant to the inquiry. What is critical is whether it cost that [local carrier] any more or less to provide the identical service to Qwest as it did to AT&T.' "

The Rehearing Decision also rejected the proposition that the withholding of payments by the Contracting Carriers was sufficient justification for the different treatment. The Commission stated, "The correct question is not whether the Defendant [local carriers] had a rational basis for deviating from their tariff, but whether they had a rational basis for not offering those same discounted off-tariff contract rates to similarly situated customers like Qwest." The local carriers' "need to preserve revenue" from the Contracting Carriers was not a rational basis for the different treatment of Qwest. On that point, the Rehearing Decision appeared to accept Qwest's argument that the 2016 Decision "misconstrues the nature of the rational basis test and adopts a meaningless standard that neuters Section 453 and 532" and "is indefensible since it has the effect of immunizing discriminatory conduct so long as it aligns with the public utility's financial self-interest."[21]

---

[21] We recognize the evidence showed petitioner Cox provided a discount on switched access rates to AT&T based on AT&T's purchase of unrelated services, not due to the withholding of payments. The distinction does not affect our analysis of Qwest's discrimination claims.

C.    *Analysis of Petitioners' Claims of Error*

   1.    *Petitioners Have Not Shown the Commission Erred on the Merits*

The focus of petitioners' briefing is that the Commission committed *procedural* errors in promulgating the Rehearing Decision, not that the Rehearing Decision's *substantive* analysis of Qwest's discrimination claims is contrary to law.  Nevertheless, we recognize petitioner Cox asserts in support of its petition that the 2016 Decision's analysis was correct, and all petitioners make brief claims of substantive error on reply.

We need not and do not address petitioners' arguments in detail, because petitioners fail to provide reasoned argument with citations to authority that the Commission was obligated to adopt the 2016 Decision's analysis of Qwest's discrimination claims, *where the service at issue is a monopoly bottleneck service.*  This new legal determination drove the Rehearing Decision's reconsideration of the facts.  For example, the Decision stated, "we did not intend for the distinguishing characteristics we discussed in [the 2011 Decision], such as call volume and costs of negotiation, to apply to customers of a monopoly bottleneck service."  Similarly, the Rehearing Decision reasoned on the willing and able issue, "If we were to require Qwest or any other [long distance carrier] to have to accept the exact same terms and conditions in contracts that include a monopoly bottleneck service along with other dedicated or non-jurisdictional services, we would defeat the purpose of our statutory obligation to prevent discrimination under section[s] 453 and 532."  Petitioners fail to show the Commission's legal analysis violated any statutory directives or applicable controlling authority.  In particular, petitioners have not shown the Rehearing Decision is based on an unreasonable interpretation of the relevant statutes.  (*Pacific Bell Wireless*, *supra*, 140 Cal.App.4th at p. 729.)

Petitioner Cox primarily relies on the decision in *Hansen*, *supra*, 42 Cal.3d 1172. That case, in which nonresidents paid higher water rates than residents, stated, "the fact that nonresident users of public utility service are subject to a higher rate than those customers residing within city limits does not alone prove the rate unreasonable and hence invalid. Rather, nonresidents must show that the discrimination is not based on 'cost of service or some other reasonable basis.'" (*Id.* at p. 1181.) *Hansen* held the rate differential could reasonably be based on the circumstance that city residents, unlike nonresidents, supported the water system through payment of taxes and water bond liens. (*Id.* at p. 1184.) Nothing in *Hansen* precluded the Commission from concluding that certain non-cost-related bases are unreasonable in the context of the switched access monopoly bottleneck service.

We also reject as unfounded petitioners' assertion that the Rehearing Decision imposed on them the burden of showing a rational basis for the rate differential. The Commission stated that Qwest's "evidence supports the conclusion that the costs of providing . . . switched access to Qwest was (is) the same as providing it to the [C]ontracting [C]arriers because tandem switching and transport elements are priced on a per-minute of use basis regardless of volume or the identity of the [long distance carrier]." Petitioners have not shown insufficient evidence supports that finding.[22]

---

[22] Petitioners also fail to show insufficient evidence supports the Commission's finding that "[t]he evidence in the record demonstrates that Qwest was willing and able to meet the intrastate switched access service related terms and conditions of each of the contracts." Notably, petitioner Cox's argument in this regard is premised on the assumption that Qwest was required to accept "the complete contact terms," not just those related to switched access services. We also reject petitioner Cox's contention the

31

Accordingly, the remainder of this court's analysis proceeds on the basis that the Commission did not err in concluding that requiring Qwest to accept all the terms and conditions in the agreements with the Contracting Carriers would undermine the Commission's ability to prevent discrimination in pricing a monopoly bottleneck service and that the differential treatment of Qwest was not supported by differences in the cost of providing the services or any other reasonable basis shown in the record.[23]

### 2. *Petitioners Have Not Shown the Commission Departed From the Scoping Memo to Their Prejudice*

More significantly, petitioners argue the Commission improperly deviated from the Scoping Memo in resolving Qwest's discrimination claim. In particular, the Scoping Memo identified Qwest's willingness to accept the complete terms of the Contracting Carriers' agreements as an issue relevant to Qwest's discrimination claim, and the Scoping Memo did not suggest that one factor, the comparative cost of providing service, would be a key

___

Commission erred by including in the Rehearing Decision a specific discussion of Qwest's discrimination claim against Cox, which was omitted from the 2016 Decision. The Rehearing Decision simply clarified that Qwest was similarly situated to AT&T with respect to Cox's switched access services for the same reason given as to the other local carriers—the services were "provided over identical facilities and at identical cost."

[23] The Commission did not identify any factors other than the cost of providing services that could justify a rate differential, but it left open the possibility that other rational bases could exist: "despite ample opportunity to do so, a review of the evidence in the record confirms that the Defendants failed to submit any other evidence that would have constituted a rational basis for discriminating against Qwest such as a difference in cost of service or other condition." Qwest bore the ultimate burden of proving unlawful discrimination. But petitioners have not shown it was error for the Commission to require them to offer a sufficient justification for the rate differential, after Qwest established that there was no difference in the cost of providing services.

consideration in resolving the discrimination claim. Petitioners have not shown the Commission prejudicially departed from the Scoping Memo.

Petitioners rely on the language in section 1701.1, subdivision (b)(1), requiring the preparation of a "scoping memo that describes the issues to be considered," and the language in section 1701.2 requiring that cases be heard "in the manner described in the scoping memo." (§ 1701.2, subd. (b).) Further, section 1701.2, subdivision (e) provides, "The [C]ommission's decision shall be supported by findings of fact on all issues material to the decision, and the findings of fact shall be based on the record developed by the assigned commissioner or the administrative law judge." But petitioners have not shown any deviation from the Scoping Memo was significant or that they were prejudiced by it. In arguing they were prejudiced by the Commission's changed legal analysis, petitioners assert, "The narrow test applied in the [Rehearing] Decision represents a significant departure from the Scoping Memo that, consistent with the 2011 . . . Decision, implicitly apprised the Petitioner and the other defendants that the 'willing/able' issue offered a defense to Qwest's claims of discrimination. The Scoping Memo contained no express reference to the direct cost of service." They argue the Rehearing Decision narrowed the rational basis inquiry "solely to one of comparable costs" and "abandon[ed]" the willing and able inquiry altogether.

We agree the 2011 Decision and the Scoping Memo gave petitioners reason to believe Qwest's discrimination claim would fail if Qwest were not willing and able to accept *all* the terms of the agreements with the Contracting Carriers or if there were non-cost-related considerations that

33

supported different treatment.[24]  However, petitioners have not demonstrated a violation of section 1701.1 and/or section 1701.2.  The Commission did *not* fail to consider the issues described in the Scoping Memo.  Instead, with respect to the willing and able issue, the Commission acknowledged the record showed that Qwest was only "willing and able to meet the intrastate switched access service related terms and conditions" of the agreements, but the Commission concluded that was legally sufficient in the context of a monopoly bottleneck service.  And, with respect to the similarly situated/rational basis issue, the Scoping Memo did not specify any particular factors that would be considered in the analysis, so the Commission's determination that certain factors were not relevant was not contrary to the Scoping Memo.

Further, petitioners have not shown they were prejudiced by any departure from the legal framework expressed in the 2011 Decision and Scoping Memo.  Petitioners identify no evidence they could have or would have presented had they been aware the Commission would ultimately conclude the exemplary factors briefly referenced in the 2011 Decision (" 'volume, calling patterns, cost of negotiation, etc.' ") did *not* constitute a rational basis for different treatment in light of the record developed in the evidentiary hearings and the monopoly bottleneck nature of switched access services.  Importantly, the petitioners knew prior to the evidentiary hearings that Qwest's position was, as described in the 2010 Decision, that different rates could be justified only " 'where the provider . . . establishes that the relevant economic cost . . . varies between customers.' "  Nothing in the

---

[24] Notably, the only issue decided in the 2011 Decision was "whether Qwest's complaint had been wrongfully dismissed for failure to state a cause of action," and the 2011 Decision did not even explain why the 2010 dismissal was improper.

Scoping Memo prevented or discouraged petitioners from presenting evidence that their different treatment of Qwest could be justified by a difference in the cost of providing switched access services. And petitioners have identified nothing that prevented them from countering Qwest's evidence that there was *no* cost difference with their own evidence of any such difference.

Notably, petitioners cite to nothing in the record showing they claimed at any point during the proceedings below that the different rate charged to Qwest was based on or could be justified by a higher cost of providing switched access services to Qwest. Indeed, petitioners specifically argued the lower rate offered to AT&T and Sprint was due to those long-distance carriers withholding payments or agreeing to buy unrelated additional services, not lower costs. Further, the Rehearing Decision observed, "the Defendant [local carriers] did not submit any evidence suggesting that their costs of providing intrastate tandem-routed switched access to the [C]ontracting [C]arriers were lower than providing the same to Qwest. A review of the record indicates that Qwest engaged in vigorous discovery inquiring whether the Defendants had performed cost of service studies or demand studies in connection with the off-tariff contracts. Universally, the answer was no." The absence of such studies significantly undermines any argument that the discounted rates provided to AT&T and Sprint were cost-based. Accordingly, petitioners have shown no basis to conclude they could have made a different showing had the Scoping Memo stated that the cost of providing service would be critical to the Commission's resolution of Qwest's discrimination claim.

Bullseye and Arrival et al. assert on reply that they "did submit evidence and testimony showing that their costs to serve Qwest versus the other carriers was likely to be significantly higher based on differences in

35

points of interconnection, call routing, and traffic types. . . ."  However, they provide no record citation to support that assertion,[25] and, as noted previously, petitioners have not shown insufficient evidence supports the Commission's finding that Qwest met its burden of showing differences in costs did not justify different treatment.  Petitioners argue there was no evidence of the *actual* cost of service, but they do not show the Commission erred in relying on Qwest's expert's testimony that the costs were identical because, as explained in the Rehearing Decision, "tandem switching and transport elements are priced on a per minute of use basis regardless of volume or the identity of the [long distance carrier] customer."

Petitioners cite the decisions in *City of Huntington Beach v. Public Utilities Com.* (2013) 214 Cal.App.4th 566, and *Southern California Edison*, *supra*, 140 Cal.App.4th 1085, to support their assertion that "[t]he Commission may not depart from the scoping memo in a proceeding in a manner that results in prejudice to a party."  Those cases do not hold the Commission may not "depart" from a scoping memo and they do not support a finding of prejudice in the present case.  In *Huntington Beach*, the court of appeal held the Commission "exceeded the scope of the proceedings" by concluding a construction project preempted local ordinances where "[t]hroughout the PUC proceedings, the parties and the [C]ommission emphasized that a court, not the [C]ommission, would adjudicate the validity of the City's municipal ordinances." (*Huntington Beach*, at p. 570.)  Indeed, the court observed, "Importantly, the parties stipulated that the validity of any City ordinance would not be resolved by the [C]ommission," and the

---

[25] If, in fact, petitioners Bullseye and Arrival et al. did submit such evidence of a cost differential, it would further establish that the Scoping Memo did not mislead petitioners to believe such evidence was irrelevant.

36

scoping memo in the case said the proceeding would "not adjudicate the legal validity of" the City's ordinances. (*Id.* at pp. 576, 578.) In that context, the court rejected "the notion that the scope of the underlying proceeding can be expanded during the reconsideration process to the detriment of a party" and held "the [C]ommission violated the procedural rights of the City and thereby abused its discretion by purporting to 'preempt' City ordinances through its 'approval' of the Project." (*Id.* at pp. 592–593.) In the present case, there was no stipulation or express language in the Scoping Memo equivalent to that in *Huntington Beach*; and, as explained previously, petitioners had opportunity and reason to present evidence on the cost issue during the evidentiary hearings.

In *Southern California Edison*, *supra*, 140 Cal.App.4th at page 1091, the court of appeal held the Commission "violated its own procedural rules" in rulemaking regarding the payment of prevailing wages on energy utility construction projects. The scoping memo in the case described the issues in the proceeding as "whether to adopt rules to prohibit 'bid shopping' and 'reverse auctions' . . . . Neither the preliminary scoping memo nor the scoping memo suggested that the scope of issues to be addressed included consideration of a proposed prevailing wage requirement." (*Id.* at pp. 1104–1105.) In that context, the court concluded the Commission "failed to proceed in the manner required by law" by considering prevailing wages, which was "beyond the scope of issues identified in the scoping memo," and by giving the parties only three business days to address the new issue. (*Id.* at p. 1106.) In contrast, in the present case, the Rehearing Decision did *not* resolve issues not encompassed by the Scoping Memo, and petitioners had adequate opportunity to provide evidence on the issues addressed in the Rehearing Decision.

Petitioners assert their "evidentiary showing would have been quite different if the Scoping Memo in 2012 reflected the Commission's current view that only differences in cost-of-service could provide a 'rational basis for different rates.' " But they fail to show that cost was excluded as an issue by the Scoping Memo and in the evidentiary hearing—especially in light of the legal position taken by Qwest and the evidence it presented. If petitioners had relevant evidence to present on that issue but failed to do so, that was their own strategic decision and they cannot now be heard to complain. Petitioners have not shown the Commission failed to proceed in the manner required by law.[26]

V. *Petitioners Have Not Shown A Refund Award Would Violate Section 532 or Section 734*

"One of the [C]ommission's express powers is the authority to order public utilities that charge unlawful rates to make reparation to aggrieved ratepayers pursuant to" section 734. (*Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 907 (*Consumers Lobby*), disapproved on another ground in *Kowis v. Howard* (1992) 3 Cal.4th 888.) After finding that petitioners discriminated against Qwest, the Commission opened a refund phase, stating "Because we have found discrimination and violations of section 453 and 532, in which Qwest was overcharged by each of the Defendant [local carriers] for the identical . . . switched access service provided to the [C]ontracting [C]arriers at discounted, below tariff rates, we hereby order, pursuant to section 734, the opening of a Phase II in order to

---

[26] We recognize, of course, that parties to Commission hearings have a right to due process, which includes " 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " (*Pacific Gas & Electric Co. v. Public Utilities Com.*, *supra*, 237 Cal.App.4th at p. 859.) Petitioners have demonstrated no deprivation of due process.

resolve the issues of refunds." As the Commission observes in its brief, the Rehearing Decision found "Qwest has been harmed to the extent it was required to pay millions of dollars more for . . . switched access than it would have paid if it had been provided with the discounted rates."

The final argument made by petitioners is that, even if they discriminated against Qwest, the Commission is precluded from awarding reparations to Qwest because any award would be a rate refund prohibited by section 532 and would constitute discrimination against *other* long-distance carriers in violation of section 734. The contentions fail.

Section 532 provides in relevant part that public utilities may not charge rates other than those on file with the Commission and may not "refund or remit, directly or indirectly, in any manner or by any device, any portion of the rates, tolls, rentals, and charges so specified." The final sentence of section 532 provides, "The [C]ommission may by rule or order establish such exceptions from the operation of this prohibition as it may consider just and reasonable as to each public utility." Petitioners also rely on language in section 734, which states that, where the Commission has found that a public utility has unlawfully charged a discriminatory rate, "the [C]ommission may order that the public utility make due reparation to the complainant therefor, with interest from the date of collection *if no discrimination will result from that reparation*." (Italics added.)[27]

---

[27] Section 734 provides in full: "When complaint has been made to the [C]ommission concerning a rate for a product or commodity furnished or service performed by a public utility, and the [C]ommission has found, after investigation, that the public utility has charged an unreasonable, excessive, or discriminatory amount therefor in violation of any of the provisions of this part, the [C]ommission may order that the public utility make due reparation to the complainant therefor, with interest from the date of collection if no

As to section 532, petitioners argue, "If there is no exception to the contract filing requirement, as the [Rehearing ]Decision holds, and because the contract rates were never filed, the only rates that [petitioners] were and are permitted to charge and receive were the *filed* rates established in their filed tariffs." They continue, "Refunds to Qwest would in effect provide Qwest the benefit of an *unfiled* rate, in violation of [s]ection 532 . . . ." As to section 734, petitioners focus on the "no discrimination will result" language, arguing "A refund to Qwest would provide Qwest the same benefit that Qwest contends was received by [AT&T and Sprint]. Accordingly, that award would result in discrimination against other [long-distance carriers] in California that, like Qwest, paid the rates established in the [filed tariffs]."

Petitioners cite no authority supporting their interpretations of sections 532 and 734. In construing the statutes, we find instructive an early California Railroad Commission decision, a prior Commission decision, and a decision of the Fourth District Court of Appeal. First, in 1915, in *Steiger etc. Co. v. S.P. Co.* (1915) 7 C.R.C. 288, the California Railroad Commission interpreted the same "no discrimination" language in section 734 in the context of a predecessor statute, section 71, subdivision (a) of the former Public Utilities Act (Stats. 1915, ch. 91, § 71, p. 164).[28] In that case, several

_____

discrimination will result from that reparation. No order for the payment of reparation upon the ground of unreasonableness shall be made by the [C]ommission when the rate in question has, by formal finding, been declared by the [C]ommission to be reasonable, and no assignment of a reparation claim shall be recognized by the [C]ommission except assignments by operation of law as in cases of death, lack of legal capacity to make decisions, bankruptcy, receivership, or order of court."

[28] The former Public Utilities Act defined the powers of the Railroad Commission (Stats. 1915, ch. 91), which was renamed the Public Utilities Commission in 1946 (*Independent Energy Producers Assn. v. McPherson*

companies filed complaints seeking reparations on the ground that the defendant had charged unreasonable rates for the shipment of goods over its rail lines.  The provision at issue there was, in substance, nearly identical to section 734, authorizing reparations for "excessive and discriminatory" rates "[p]rovided, no discrimination will result from such reparation."[29]  The Railroad Commission concluded that language did not prohibit the payment of reparations, even if other companies may have paid the same unreasonable rate.  The Railroad Commission reasoned that discrimination does not "arise because, from among those who have been injured and can establish damages, only a few seek and obtain awards of reparation. . . .  If 'A', who has been injured, does not seek redress he cannot be heard to complain of discrimination because 'B', who has also suffered a private injury, seeks and obtains redress."

---

(2006) 38 Cal.4th 1020, 1038).  In 1951, the Legislature enacted the Public Utilities Code, consolidating and codifying the law relating to public utilities, including the statutes at issue in the present case.  (Stats. 1951, ch. 764.) Section 532 mirrors section 17, subdivision (b) of the former Public Utilities Act, and section 734 mirrors section 71, subdivision (a) of that act.  (See *Consumers Lobby, supra,* 25 Cal.3d at p. 907 [identifying section 71 as "predecessor to" section 734].)  This court has reviewed the legislative histories of the 1915 and 1951 enactments, and we have found nothing that aids in the interpretation of sections 532 and 734.  Neither do the parties direct our attention to any relevant legislative history.

[29] As enacted, section 71, subdivision (a) of the former Public Utilities Act provided, "When complaint has been made to the [C]ommission concerning any rate, fare, . . . or commodity furnished or service performed by any public utility, and the [C]ommission has found, after investigation, that the public utility has charged an excessive or discriminatory amount for such product, commodity or service, the [C]ommission may order that the public utility make due reparation to the complainant therefor, with interest from the date of collection; *provided,* no discrimination will result from such reparation."

Next, in *The Mark Hopkins Intercontinental Hotel v. Pacific Gas & Electric Co.* (1987) 1987 Cal. PUC LEXIS 564 (*Mark Hopkins*), the Commission independently reached the same conclusion, and also addressed section 532. That case involved a complaint seeking interest on three years of refunded electricity overcharges. (*Id.* at *1-*2.) The defendant argued that an award of interest to the complainant would constitute discrimination prohibited by section 734 and "preferential rate treatment" prohibited by section 532. (*Mark Hopkins*, at *5.) The Commission assumed for the purposes of its analysis that there were other customers with similar claims, but rejected the defendant's objection, reasoning that the company "has not pointed out any circumstance which would have barred [other customers] from successfully prosecuting a complaint such as this. If similarly situated customers can win similar relief, the discrimination prohibited by [section] 734 does not exist, and the statute does not bar awarding interest on reparations to complainant." (*Mark Hopkins*, at *5-*6.) The Commission further concluded that the award was not precluded by section 532, reasoning that "[section] 532 should not be interpreted to prohibit an award permitted by [section] 734." (*Mark Hopkins*, at *6.) The Commission articulated as its conclusion of law, "A single customer can collect his own claim in full under [sections] 532 and 734 if all other customers with similar claims had the same opportunity to file a complaint with the Commission." (*Mark Hopkins*, at *7.)

Finally, the Fourth District's decision in *Cellular Plus, Inc. v. Superior Court* (1993) 14 Cal.App.4th 1224 (*Cellular Plus*), is also instructive. That case was an action by individual consumers and corporate sales agents against two licensed providers of cellular telephone service. (*Cellular Plus*, at p. 1229.) The plaintiffs alleged price fixing under California's Cartwright

Act, and the court of appeal held the trial court erred in sustaining the defendants' demurrers. (*Cellular Plus*, at p. 1229.) As relevant in the present case, the court of appeal rejected the defendants' argument that a damages award would necessarily "result in an illegal rate refund violating . . . section 532 or an illegal rate discrimination violating . . . section 453, subdivision (a)." (*Cellular Plus*, at p. 1249.)

The *Cellular Plus* court's analysis of the rate discrimination issue is directly applicable to petitioners' argument under section 734. There, the individual plaintiffs sought "compensatory damages in the amount and to the extent the fixed prices were excessive." (*Cellular Plus*, *supra*, 14 Cal.App.4th at p. 1250.) The court concluded the plaintiffs' action "will not result in any prohibited rate discrimination" because the "damages are not any different from what damages any other customer . . . may be entitled to, and [plaintiffs] should not be precluded from seeking compensatory damages merely because other customers do not similarly enforce their rights to damages." (*Ibid.*)[30]

We reject petitioners' contention that an award of reparations under section 734 would violate the "no discrimination" limitation in section 734 or constitute a rate refund prohibited by section 532. As to section 734, we agree with *Steiger*, *Mark Hopkins*, and *Cellular Plus* that an award of reparations to Qwest due to petitioners' rate discrimination would not

---

[30] *Cellular Plus* also rejected the defendant's argument under section 532 as to the corporate sales agents, because they sought damages for lost sales rather than a rate refund. (*Cellular Plus*, *supra*, 14 Cal.App.4th at p. 1250.) However, the court did not explain its rationale for rejecting the defendant's argument as to the individual plaintiffs, who sought compensation for the excessive rates paid. Because Qwest's posture is analogous to the individual plaintiffs in *Cellular Plus*, the decision provides no assistance in applying section 532 in the present case.

43

constitute discrimination against *other* long-distance carriers that, like Qwest, were denied the discounted rates provided to AT&T and Sprint. Petitioners do not suggest those other carriers could not also have sought the relief Qwest seeks in the present proceeding. Such reparations would not constitute discrimination absent a showing that other customers with similar claims did not have "the same opportunity to file a complaint with the Commission." (*Mark Hopkins, supra*, 1987 Cal. PUC LEXIS 564 at *7.)[31]

As to section 532, we agree with the Commission in *Mark Hopkins* that it would be unreasonable to interpret section 532 "to prohibit an award permitted by [section] 734." (*Mark Hopkins, supra*, 1987 Cal. PUC LEXIS 564 at *6.) Further, the final sentence of section 532 states, "The [C]ommission may by rule or order establish such exceptions from the operation of this prohibition as it may consider just and reasonable as to each public utility." The Commission has previously observed that section 532 provides it the "power to deviate . . . if it finds special circumstances that justify doing so. Special circumstances include inequitable or unjust results."

---

[31] Separately, petitioner Cox contends an award to Qwest would constitute discrimination against *AT&T* in violation of section 734, "because an award of refunds to [Qwest] would grant [Qwest] the benefit of AT&T's rate without imposing any of the corresponding burdens." Cox continues, "Cox charged AT&T a rate lower than its tariff rate in exchange for AT&T purchasing [an] increased volume of special access services. [Citation.] By affording [Qwest] the benefit of that negotiated rate without imposing any of the corresponding burdens or consideration on [Qwest], the Commission deprives AT&T of the benefit of its bargain." The Commission found that the discounted rate was based on AT&T's purchase of "non-jurisdictional services"—not necessarily even in California. Cox cites no authority and provides no reasoned argument that a finding of discrimination within the meaning of section 734 may be based on a comparison of the entirety of services purchased from Cox (including out-of-state services), rather than a difference in the rate paid for intrastate switched access services.

(*Western Metals & Strapping Corp. v. Brake Delivery Service – Meier Transfer Service* (1995) 60 Cal. P.U.C.2d 349, 356 (*Western Metals*).)  Petitioners do not show the Commission could not, as part of an award of reparations under section 734, declare that a refund of excess amounts paid due to rate discrimination is "just and reasonable," within the meaning of section 532.[32] In any event, given that the Commission has yet to make such an award to Qwest, it would be premature for this court to conclude in the present proceeding that any award resting on any such declaration would necessarily violate section 532.

Petitioners argue their interpretation of section 532 is supported by the California Supreme Court's decision in *Empire West v. Southern California Gas Co.* (1974) 12 Cal.3d 805 (*Empire West*).  That case is distinguishable. There, the plaintiff developer sued the defendant gas company because the developer had relied upon the company's erroneous costs analysis in installing a gas heating system.  (*Empire West*, at p. 808.)  The Supreme Court considered whether the action constituted an effort to obtain preferential rate treatment in violation of section 532.  Ultimately, the Supreme Court held section 532 did *not* apply to the plaintiff's claim, reasoning that the case did not involve rates and "a utility customer who has been actually damaged by a utility's fraudulent misrepresentations regarding

---

[32] In a footnote in their reply, petitioners Bullseye and Arrival et al. argue for the first time that the Commission could not retroactively establish an exception to the filing requirement with respect to the agreements with the Contracting Carriers.  But, assuming that is so, that would not prohibit the Commission from ordering an exception to *the prohibition on rate refunds* in the present case.  In addition, petitioners have not shown a refund in this case would constitute retroactive ratemaking, which involves improper adjustments to rates established in prior proceedings and not reparations for discrimination.  (See *Ponderosa Telephone Co. v. Public Utilities Com.* (2011) 197 Cal.App.4th 48, 61.)

matters not contained in the published tariffs should be entitled to bring suit to recover those damages." (*Empire West*, at pp. 810–811.)

The present case is distinguishable from the circumstances underlying *Empire West*'s analysis of section 532. *Empire West* did not address a situation where a utility discriminated against a complainant by failing to offer the benefit of an off-tariff rate. Instead, *Empire West* describes cases where complainants claim they were misled about the tariffed rate and attempt to obtain a deviation from that rate, even though they are charged with knowledge of the tariffed rate and could not "justifiably rely" on any misrepresentations. (*Empire West, supra,* 12 Cal.3d at p. 810.) In contrast, there was no unjustifiable reliance on Qwest's part—the off-tariff rates provided to AT&T and Sprint were simply not offered to Qwest. Further, *Empire West* involved a civil action seeking damages, not a request for reparations expressly authorized by statute (here, section 734). Finally, in *Empire West* there was no consideration of the Commission's authority under section 532 to order exceptions. In contrast to the circumstances described in *Empire West*, here petitioners claim that, because they did not file their discounted rate with the Commission and because they may have discriminated against *other* long-distance carriers in addition to Qwest, the Commission is powerless to provide reparations to Qwest. Petitioners make no effort to explain why the Legislature would have intended that result.[33]

---

[33] Petitioners argue that there were alternate remedies available to redress the discrimination against Qwest. For example, they argue that the Commission could have required the Contracting Carriers "to remit payment for undercharges to put all customers on equal footing," or that Qwest "could have sought damages for any alleged competitive injury sustained as a result of another customer paying less." We need not and do not consider the viability of those alternatives because we have concluded petitioners have not shown a reparations award would violate sections 532 or 734.

Petitioners also contend a refund award in the present proceeding would be inconsistent with the "filed rate doctrine," but they rely on cases applying federal law and fail to show the doctrine applies under California law. The federal filed rate doctrine prohibits a utility from charging rates other than as set forth in its tariff filed with the federal authorities and "presumes the consumer's knowledge of all lawful rates and bars consumer suits for damages arising out of claims involving those rates, on the premise that a consumer who pays the filed rate has suffered no injury and incurred no damage." (*Day v. AT & T Corp.* (1998) 63 Cal.App.4th 325, 329; see also *Evanns v. AT&T Corp.* (9th Cir. 2000) 229 F.3d 837, 840; *Gallivan v. AT&T Corp.* (2004) 124 Cal.App.4th 1377, 1387; *Verizon Delaware, Inc. v. Covad Communications Co.* (9th Cir. 2004) 377 F.3d 1081, 1089.) The Commission has previously acknowledged that section 532 "express[es] the filed rate doctrine," but it observed the statute grants it "great flexibility in how it regulates adherence to" the doctrine. (*Western Metals*, *supra*, 60 Cal. P.U.C.2d at p. 356; see also *Pink Dot, Inc. v. Teleport Communications Group* (2001) 89 Cal.App.4th 407, 416 ["direct application of the federal filed rate doctrine is inappropriate. ¶ . . . In California, there are limits to the filed rate doctrine"]; *County of Stanislaus v. Pacific Gas & Electric Co.* (9th Cir. 1997) 114 F.3d 858, 866 [stating that a prior California decision "declined to create a state filed rate doctrine where rates filed with the [Commission] were not subject to federal review"].) This court has already concluded that petitioners have not shown a refund award would violate sections 532 and/or 734. And, in any event, none of petitioners' authorities applying the federal filed rate doctrine involve circumstances similar to those in the present case, involving an anticipated Commission reparations order authorized by the Public Utilities Code to remedy discrimination, rather than a damages award in a

court action under another statutory scheme. (Cf. *Day*, at p. 337 [concluding, in case subject to federal law, that filed rate doctrine precluded monetary recovery in an unfair business practice action].)

Petitioners have not shown that any refund award to Qwest would violate section 532 and/or section 734.[34]

DISPOSITION

The Commission's decision—D.19-05-023, as modified by D.20-07-035— is affirmed. Respondent and the real party in interest shall recover their costs in this proceeding. (Cal. Rules of Court, rule 8.493(a)(1)(A).)

_____

[34] In construing sections 532 and 734, we have given the Commission's view "consideration and respect." (*Yamaha Corp. of Am. v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7.) Because we reach our conclusion without extending any special deference to the Commission's interpretation of the statutes, we need not decide what level of deference would be appropriate where the question is the Commission's authority to issue reparations for discrimination. (See *New Cingular*, *supra*, 246 Cal.App.4th at p. 807 [concluding Supreme Court's *Yamaha* decision, rather than the *Greyhound* decision, governs review of Commission's "interpretation of a statute that defines the reach of its power to enter the awards under review"].)

_____

SIMONS, Acting P.J.

We concur.

_____

NEEDHAM, J.

_____

RODRIGUEZ, J.*

(A160729, A160908, A160937)

---

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Original proceedings; petition for a writ of review of decisions of the California Public Utilities Commission.

Goodin, Macbride, Squeri, and Day, Thomas J. Macbride Jr. and Megan Somogyi; Klein Law Group, Andrew M. Klein, Allen Zoracki for Petitioner Bullseye Telecom Inc.

Goodin, Macbride, Squeri, and Day, Thomas J. Macbride Jr. and Megan Somogyi for Petitioners Arrival Communications, Inc., Mpower Communications Corp, and U.S. TelePacific Corp.

Tobias Law Firm, Margaret L. Tobias; Coblentz, Patch, Duffy, & Bass, Richard R. Patch, Clifford E. Yin, Laura R. Seegal for Petitioner Cox California Telecom, LLC.

Arocles Aquilar, Mary McKenzie, and Maria Bondonno for Respondent.

Law Offices of Leon M. Bloomfield and Leon M. Bloomfield; Perkins Coie, James W. McTarnaghan for Real Party in Interest